Good morning to all of you. My name is Dale Gallipo. I'm representing Mindy Losee, who is the mother of Breanne Sharp, and she's present in court today. I realize there's been a lot of cases and talk about shooting cases, both in the media and in our published opinions, both in the Ninth Circuit and with our Supreme Court. But I would submit in this case, and I really want to focus, if I can, on the first four shots by Officer Zushin, because I think it's very important to look at those independently, that if you take all the plaintiff's facts as true, and you take all reasonable inferences therefrom, that this case should go to a jury, both on the federal and state claims. With respect to Officer Zushin? Right. And I really think you can parse out the officers, because I think that's the case. Well, I was going to ask you that, because as to the others, at that point, Ms. Sharp's car, the Honda, is coming towards them. Yes. It actually hits one of them. So what I was going to ask you, and maybe your argument suggests this to be the case, isn't it a different case with respect to the other officers than Officer Zushin? Yes. And as to them, don't they have a reasonable apprehension that they're in danger? I think, yes, with one possible caveat. Now, as you tried to point out in the paperwork filed, the Ms. Sharp was shot, two-shot struck her, one to the head, fired by Zushin. Right. At least you have evidence of that. Right. And one by to the left shoulder, fired by Officer Vega. The problem that we had with Vega's shot was that he continued shooting as the car was passing him. Well, but it then, there's two officers after that, and she actually comes close to the other two. That is true. So I guess what I'm saying is that separating Zushin from the others makes sense to me. Who is he? Okay, who shot her in the shoulder? Zushin shot her in the head. Who shot her in the shoulder? That was Officer Vega, Judge Wardoff. Right, which after she hit the tree, skinned the other car, and continued towards him and Officer Quigley. Correct. And one of the, from our perspective, and we cited their policy, which we believe Zushin violated, one of the reasons that shooting at drivers of vehicles is discouraged, unless it's a true immediate defense of life, is because you're likely to disable the driver, which could then make it more dangerous to not only the public, but other officers. Right, so arguably, Zushin's, because Zushin shot to the head, that could have disabled her to the point that it caused the rest of, you know, banging into the utility pole and everything else. But the rest of the police don't know that, right? Correct. They just know that a car is coming towards them. Correct. And in fact, I'm not even sure if some of the officers knew who was firing the shots. I mean, they heard shots fired. They heard shots. It was so chaotic. So you correctly wanted to focus on Zushin. And so, again, because Casella is the 800-pound elephant in the room, tell me, and the Supreme Court seems to have difficulty upholding cases in which we don't find qualified immunity when there's police shootings, tell me what your best case is for the clearly established right. I had a feeling you were going to ask me that question, Judge Hurwitz. But I have several cases. Because this is deadly force and because it involves someone fleeing, in this case, in a vehicle, I would submit we really go back as far as Tennessee v. Garner. But more recently, in the Ninth Circuit, in Ninth Circuit cases, two that we cited from the Ninth Circuit, Adams v. Spears, a 2006 case, and A.D. v. California Highway Patrol, a 2013 case from the Ninth Circuit, that was decided and published according to some information I have about five months before this incident. We also cited some Sixth Circuit cases. I realize they're out of circuit. But Smith v. Cupp. But they're important to Judge Oliver. It's an important circuit. I happen to originally be from that circuit, from Ohio, northern Ohio. But Sixth Circuit case, Smith v. Cupp, 2005. And Kirby v. Duva, Sixth Circuit, 2008. In addition. Okay. So you've got all the cases you've read, I've cited. Let me tell you what concerns me and maybe you can help me. Before Officer Zushin fired here, as I reconstruct the events, your client had been, somebody followed your client with the lights on. There's actually two police cars that flashed lights at her. She'd gone down a street, hit a curb, turned around, come back out, hit a curb again, hit a utility pole. And then as Officer Zushin approaches the car from behind, she's backing up towards him. He may or may not, let's assume for purposes of this case that he could have gotten out of the way. Do all those events that occurred before the shots here distinguish those other cases? Because most of those are just somebody fleeing or somebody takes a shot at someone. I would say part of the distinction, no. I would say no. And I would say this is not a high-speed pursuit, as we've seen in some other cases even talked about by the Supreme Court. No evidence of threats or weapons. I think what's most important, I think the record's fairly clear that before she hits that pole, it would have been inappropriate to shoot and kill her. I agree. So while she's on Vista Verde, nobody should be firing at her. And what I think's important, and again, taking all the reasonable inferences in favor of the plaintiff for purposes of this motion. Once she hits the pole and he's some distance away towards the rear of his vehicle at first, he sees the reverse lights come on. He says that 10 or 15 seconds, I think his estimate's a bit long, but 10 or 15 seconds pass between seeing the reverse lights and his first shot. And so for him to approach the rear of the vehicle, I don't really believe he did. I think it's an issue of fact as to where he was exactly. Sotomayor Well, tell me why there was an issue of fact. There's no expert testimony about where he was. So the only thing in the record is his test. I understand the expert testimony about the speed of the car and things. But what evidence is there that he wasn't where he was? Carvin We cited, well, there's just a discrepancy between his statement and his deposition. Sotomayor There's a discrepancy about when he shot. Carvin True, but he also He said initially he was going to vehicle C23 to take cover. That's what he said in his statement. In his deposition, he has himself more in the open. But I think what's really important is he had noticed that the car was coming back. There's evidence that the car only moved 6 to 8 feet, which we think is very important. I asked him how close did it get to him. I don't know. Sotomayor He said 10 to something, 20 feet. Carvin How fast was it going? I don't know. So I think there's evidence that that car only backed up 6 to 8 feet, because obviously it had to back up to continue to go. And maybe more importantly, I think it's more likely that the shot that hit her in the head was not one of the first two shots, because I think a reasonable inference could be it's unlikely that after she was shot in the head, she then would have been able to take the car from reverse to drive. So that's exactly what I want to ask you. So thank you for getting there. So let's assume that he was an officer. Zushin was not justified in shooting at the car as it backed up. But apparently he didn't hit her with either of those shots. We don't know. Well, she only got hit with two shots and one was in the head. And then she's leaving and heading towards the other officers. Is he justified then? Well, no, I would suggest both groups of shots by Zushin are excessive and unreasonable. And certainly it should go to a jury on both the Federal and State claims. The first shots, for the reasons we already discussed, slowly backing up 6 to 8 feet, I don't even think he was close to being about to be struck and he clearly had room to get out of the way and he violated his own policy. The next two shots, by his own admission, the vehicle's pulling forward. And that's what I was asking. The vehicle does a U-turn. But this is what's important, Your Honor. Again, all reasonable inferences in our favor. And if you look at part of the record, the U-turn happens after the two shots. I know the defense wants to suggest that she was making this wild U-turn and then that's when he fired those two shots. But those two shots, when you take the reasonable inferences in the plaintiff's favor, happened almost immediately after the car started moving. And is there evidence in this record that those two shots were also from the rear? Oh, there's no question, because he admits he shot through the rear windshield on those two shots. He admits that there was a slight pause between the two shots. He claims he quickly said shots fired. Yeah, we have four shots, right? Right. The first two through the back windshield. The second two, he says he shot through the back windshield. And importantly, he was asked at deposition, did you look to see if there were any officers in front of the car, around the car, anywhere near? Yes. Did you see any officers? No. So that, I think, is very important to the analysis of the immediate threat, because there was no one in front of the car. He didn't see anyone in front of the car. He looked. So from our perspective, those two shots are even more egregious than the first two. And it's probably that she was shot by one of it. But I think a jury can easily find that all four of his shots were excessive. Could you go back for a second to the decedent's actions before the shot? I mean, we've got here somebody who won't stop on police commands. They're not saying stop, but they've got their lights on. She hits a curb. She hits a curb. She hits a utility pole. And then she starts backing up. Those are the facts.  I think those are disputed. Did they take us out of the clearly established law category? No. It's a traffic stop, right? I mean, so they were going to stop her for a broken headlight? Right. Because what you would then have, Your Honor, you'd have a situation where, and let's face it, there's a lot of different reasons, some good and some not so good, most not so good, and sometimes, you know, not well thought out, that any person, including a young person, may not stop for the police. Well, it turns out she's on methamphetamine. Right. But again, as although they tried to cite a lot of information in their briefing that was not known by the officer at the time, we don't think that's part of the analysis that the Court has. Well, it is. And once you start saying there's lots of reasons why somebody has to stop, now we know the reasons she has to stop. Yes. So what I'm saying is that that does not elevate all of a sudden it's okay to shoot and kill people and give them the death penalty. I mean, truly, I mean, one of the things that I feel has been pretty clear in the law for a long time, if you're talking about deadly force, you're talking about something that should be an imminent threat of death or serious bodily injury. And if it's not there, or if there's facts that a jury may find it's not there, then there's evidence to support the shooting's excessive. And based on that, I'm sorry, Judge Oliver. No, I was just going to make sure that before your time is out, that you address Vega. I think that you said Zoshen and Vega were there too. And I think you've spent most of the time, because we've been asking you questions about the fact that you felt there was evidence to suggest there was no threat to the officers and to the public that would justify the firing of those shots. Vega, I think you want to address. Yes. And then the other question that I had tied to that, are you acknowledging that as to the other officers, the qualified immunity was appropriate and therefore, you agree that at least they should be out of the case? Okay. So let me take the latter first. If that's okay, Judge Oliver. With respect to the other officers, I don't think qualified immunity would necessarily apply to them, but because the forensics was such that none of them struck her, we decided we don't have to pursue those claims against them. I don't think it's important because we were most concerned with the two shots that actually struck her and Zoshen was the main one, but let me address Vega. Now, I will agree, as Judge Hurwitz pointed out, that a lot changes after those first shots and she struck in the head, and a reasonable inference the car may be somewhat out of control now because she's got a fatal wound to her head. However, if you look carefully at the cites to Vega's testimony, he stood in one spot, which he clearly, we don't believe, or a reasonable inference is he was not on the path of the car because he never moved. He says he was standing there for 40 seconds, but I think, again, his estimates long, and I do understand Judge Hurwitz and to the panel that there were other people they thought that could be somewhere around, but what bothers me most about Vega's shots is not even his first shot per se, necessarily, but as he's continuing to shoot through the open or through the driver's window of that car as he's standing some distance away, as it's passing by him without seeing anyone in the path of that car, anyone about to be struck by that car, and he sees one of his shots, she sees her flinch, so he was confident that one of his shots struck her, and we believe that, obviously, the shot that struck her to the left shoulder. Those shots, we think, at least a jury could find, were excessive and unreasonable. At that point, she'd already gone up on the curb, hit a tree, skinned, I think, Officer Selland's car or somebody's car, and is headed towards where Officers Cumber and Quigley are. So, you know, whether it's a closer call, at that point, isn't there at least a reasonable apprehension? It's a closer call. Yeah. It's a closer call. It's a close call. However, doesn't the Supreme Court tell us if it's a close call, it goes to the cops? No, well, not necessarily, although the Supreme Court has had a lot of things to say recently, but not necessarily, because, again, you've got to take it from Vega's perspective. Vega says the car's passing me, I don't see anyone in front of it, I don't see anyone about to be hit, I continue to fire multiple shots through the side of the car. We, again, believe the law's clearly established and it would be up to a jury to decide. I agree. What we now know is that these other officers say, gee, it was kind of coming my direction, too, but Vega didn't see that or know that at the time. But don't we do we look at it as subjective, or what the objective facts are? Objective, and that's the whole thing. I think a lot of the officers, it's subjective. They thought they were about to be run over, but they're not in the path of the car. They thought someone would be run over by the car, but they didn't see anyone in its path. So that's the issue we have. All right, counsel, you're over. I'm very sorry. Thank you all very much. Thank you. Good morning, Your Honor. Sharon Medellin on behalf of Respondent's City of Chico and the individually named Chico police officers. I'd like to begin by addressing some of the testimony that counsel described from Officer Sergeant Session and Officer Vega. With respect to Officer Vega, he clearly testified that he knew that Officer Selland's vehicle was immediately next to his, that he saw Ms. Losey, I'm sorry, Ms. Sharp driving directly in his direction as well as the direction of Officer Selland, that he knew at least one other police officer was behind him because during the pursuit, an officer had given him the right-of-way when coming around the corner onto 8th Street. So although he couldn't identify who specifically that officer was at the time, he knew there was at least another officer behind him and in the path of Ms. Sharp's vehicle. With respect to Sergeant Session, he testified that as Ms. Sharp started to pull away, he scanned the horizon. He could see things in his periphery. He knew that there were police vehicles positioned in the street behind him. He saw her drive in the direction of residences on this street. Okay. So to break down her actions here, because I think it, let's assume just for purpose of the discussion that once she turned towards the police officers, maybe Officer Session would have been reasonable in firing, but there's evidence in this record that he fired as she was backing up towards him. Correct. At that point, we just have a bad driver and a traffic stop. We don't have any violence that's occurred towards anybody. And we have some case law that says, gee, you shouldn't, if you can get out of the way, you should get out of the way rather than firing. So is he firing in self-defense at that point or is he firing to protect other people? It's both. Well, if it's in self-defense, doesn't ACOSTA suggest that your first self-defense is you just step sideways? Well, and that's the thing. The officer, Sergeant Session also testified during his deposition that there was a vehicle to his left. There was a vehicle behind him. There were bushes to the right. And at that moment, he didn't have anywhere to go. So to say that he could have, he should have taken a chance and tried to run around a vehicle, essentially... Let me ask you something. When we do, when we talk about excessive force, there, you do, you don't have to do the least alternative, but we do sort of weigh, have you tried some of these cases, you weigh like what the threat is versus what the level of force, that's the way they do it. That's how an expert would testify about it. And why shoot the driver? Why not shoot the tires of the car? Or, I mean, why do you go for the head of the driver? Well, there's actually a policy that says that the, that an officer is not supposed to shoot at a vehicle in a manner that is intended to disable the vehicle. That would be a policy violation. So you'd rather have him kill a person than shoot at the vehicle and disable the vehicle? I'm sorry? There's a policy that you'd rather have him kill someone than shoot at the vehicle and disable the vehicle? No, that's not, that's not what the policy says. What the policy says... So we're talking about levels of escalating force. Correct. Correct. That's not, that's not what the policy says. And actually, on the subject of the policies, one thing that is missing from the appellant's view of the facts here is the idea that we do have a policy that's directly on point that's, that's completely ignored. It's policy 304.4.1, which says an officer may, as here, discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes that there are no other reasonable means available to avert the threat. Yeah, but your policy doesn't establish the constitution. Your policy may be evidence at a trial, which I'm trying to figure out here whether or not there was a constitutional violation, and if so, whether there's clearly established case law. So break down those four shots for me. Officer's Russian, she's backing up towards him. He says he fires two shots while she's backing up towards him. Correct. Then she pulls away. In a direction away from the officers. I think it's east on 8th Street, but I, I may have my compass turned the wrong way, but she's turning, she's going in effect to the, away from the officers. And there's evidence in this record that he fires twice again into the rear of the car. So what's the justification? Even if I assume that the first two shots were to defend himself, what's the justification for the second two shots? The residences that she was driving towards. She wasn't driving down the street. She was headed northeast. He was shooting at that point to protect the people inside the houses. The people he's, he testified in the residences and the officers that he knew her. Well, there weren't, but again, there were no officers fought in the direction she was going. She was going, she started away from the officers. Correct. But he testified that she started in a, she wasn't moving in a straight motion. She was moving in a turning fashion. And so he testified that the direction of. Right. And he may be right and the jury may believe him, but taking the facts in the light most favorable to the plaintiff in this case, she was driving, the decedent was driving away from where the officers were and Officer Zushin, even if he was justified in firing the first two shots to protect himself, fired two more into the rear of the vehicle, probably the one that killed her. Is the justification for that simply that she may have run into a house or somebody? Yes, she may. Yes, that she was. Does that make her like any drunk driver? No, no, absolutely. Absolutely not. And I'm listening here and I'm, obviously you can, you may have to shoot to protect the public, use excessive force, use force to protect the public or protect officers. But the notion that what she was driving fast down the street and therefore there was a danger to the residences. I'm not sure about that argument. I think one thing to consider in this case, not necessarily the speed at which she was driving. I mean, obviously she was driving at a sufficient speed to create the tire friction marks that were at the scene and that sort of thing to sever a tree, those sorts of things cause significant damage to police vehicles. But in addition to that, what we need to look at is the space where this incident occurred. If there's a diagram of this and it is a very confined space, even more so when you look at the number of police vehicles that are positioned in the street. So it's not necessarily the speed what compounded the danger to the officers in this situation was the confined space. That's why I'm asking you to focus on, I'm, I understand your argument with respect to once she makes that turn and she's out of control and she's heading towards the cars. I understand that officers might have at that point a reasonable apprehension that they're going to be harmed. Right. But I'm trying to focus on Officer Zushin at a point when she just appears to be fleeing in the other direction. At least if you take the facts in a light most favorable to your opponent. And again, take out the backing up. Let's assume that he was entitled to fire then. Why is he entitled to fire just as she pulls away? Because it is, he personally saw that she was headed. She wasn't headed in the direction just down the street where there was nothing in front of her. She was headed toward in a turning direction toward homes and other vehicles and people positioned in the street. That's, that's the distinction here. And I do want to add that there are cases that, that stand for the proposition that in order to establish qualified immunity, the department or the officers don't need to show, point to a specific individual and say that person was in the path of travel. It's sufficient that there is a reasonable threat to people, officers who may be in the vicinity. And in that regard, I would refer to the Briseau case, Scott v. Holland, Hill v. Nigro. All of those cases stand for the proposition that if the officer reasonably believes that there is someone in the path of travel. But it has to be a reasonable belief. Yes, and that's correct. And we know here that there were plenty of people in the path of travel. She narrowly hit missing two officers, struck two police vehicles. I mean, the idea that there wasn't a reckless. Troubles me is that I had mentioned it in the first argument is that in a way vision shot to her head actually increased the danger to other people because that put a disabled person driving this car and that's when other things started happening. She went into the pole and all that. And I mean, it's almost like that shot exacerbated the danger. It didn't decrease the danger. I understand that point. But in terms of whether the Fourth Amendment claim where there was a right that was clearly established and whether that the officer was entitled to qualified immunity, there was no point on case that says that by doing what officers did, he unreasonably. We have plenty of cases on point that say when someone's fleeing the officer, they're not in imminent danger of being. And that's not an officer session is clear that that's not the reason he fired. I was not flee. He's clear, but we have to look at the record in the light most favorable to your opponent. And we've got all kinds of diagrams and we've seen it appears that at least for some and it appears that four shots go through the rear of the car. Correct. So if they're going through the rear of the car, how can she be headed towards the other officers at the time given where officers session was positioned where he as she's pulling away. That is his his. The direction that he fires it. That's how he strikes the vehicles from the rear. But you have to watch. She's not headed towards the other officers. No, that's not exactly not exactly true because she's in us in a turning direction. She's not traveling straight. So from when when she when he fires, he's firing from where she takes off from the location where she stops puts the car and drive and takes off again, but it's not a straight path down the street. She's heading and turning into a residential area and the direction of where the off other officers are in the street. So there are plenty of things in her path of travel. I understand. Okay. Okay. In addition, I did also want to mention the idea that the district court didn't give appropriate weight to the to the idea that that Sergeant Sessions shots, you know, potentially incapacitated her. I just want to want to reiterate that the the that allegation is essentially immaterial because of the the requirement that under Graham that cases of excessive force like this be judged from the perspective of a reasonable officer without the you know, the benefit of 2020 hindsight. So the rest of the officers who were behind him and fired after Sergeant Session had no reason to believe that she was incapacitated. The threat remained the same and this is a wrongful death case, correct? I'm sorry. This is a wrongful death case. I it's I'm I believe that there was a state claim for wrongful death, but it's I'm trying to figure out the shots that missed given that that other shots hit are we concerned with the shots that missed in this case? No, I believe that all of these shots were were found within within the vehicle was working. We're concerned with the two shots that actually struck the decedent. Are we not? Well from the from the department's perspective, even those those particular shots were reasonable. It's not but I'm asking where we understand worry about the other one. We understand your where he's asking you about the other officers that it's okay that they shouldn't be in this case. Oh, absolutely. Absolutely. They there were they were completely justified at the very whether or not they were justified. I'm asking a separate question. We have only two shots hit correct miss and and this is a case in which she was killed. Correct. So are we really worried about the shots that other officers fired that missed? No, I know whether they were reasonable or not. No, I'm part of this case. No, I don't believe so. Okay, that's all he's asking. Yeah, that was okay. I'm sorry. You know, it's better than that. I misunderstood the question and my apologies. Okay. Okay. Well, I think do you have any I don't think we have any other questions. So, okay. Thank you. We'll submit the case of low C versus city of Chico and we previously submitted Nelson versus flowers foods. And so this court will adjourn for today. Thank you very much council. Thank you.
judges: Wardlaw, Hurwitz, Oliver